**FILED**

**MAY 17 2012**



CLERK

UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
SOUTHERN DIVISION

| | | |
|---|---|---|
| DORI L. HANNEMAN, | * | CIV 11-4113-RAL |
| | * | |
| Plaintiff, | * | |
| | * | |
| vs. | * | OPINION AND ORDER |
| | * | VACATING AND |
| MICHAEL J. ASTRUE, | * | REMANDING THE |
| Commissioner of Social Security, | * | COMMISSIONER'S DECISION |
| | * | |
| Defendant. | * | |

Plaintiff Dori Hanneman seeks reversal of the Commissioner of Social Security's decision denying Hanneman's application for Social Security Disability Insurance ("SSDI") benefits. Alternatively, Hanneman requests that this Court remand the case for a further hearing on various issues she has raised.[1] For the reasons explained below, this Court reverses the final decision of the Commissioner and remands to the Social Security Administration for further consideration of Hanneman's application consistent with this Opinion and Order.

## I. Procedural Background

This case involves Hanneman's second filing for SSDI benefits. Hanneman filed a prior application for SSDI benefits on March 29, 2001, alleging a disability onset date of September 9, 1998. AR[2] 13; Doc. 18-1 at 4. Administrative Law Judge ("ALJ") Robert Maxwell held a hearing and issued a decision on July 21, 2003, finding that Hanneman was not disabled from September 9, 1998 through the date of that decision. AR 13; Doc. 18-1.

---

[1] Hanneman entitled her appeal a "Motion for Summary Judgment." Under the Standing Order of this Court filed on December 5, 2000, summary judgment is not the means for disposition of Social Security appeals in this district. Rather, once a plaintiff files a complaint and the defendant files an answer in a Social Security matter, the court enters an order setting a briefing schedule and thereafter makes a determination concerning the Commissioner's decision. This Court entered such a briefing schedule, Doc. 6, and Hanneman's appeal is ripe for decision by this Court.

[2] Citations to the appeal record will be cited as "AR" followed by the page or page numbers.

On September 8, 2008, Hanneman filed the instant application for SSDI benefits, alleging that she was disabled since December 28, 1999, due to breast cancer, fibromyalgia, thoracic outlet syndrome, reflex dystrophy, brachial plexus neuritis, Raynaud's syndrome, acid reflux, hyperemia and cellulitis in the right chest, intractable pain with numbness of the chest, arms, and hands, idiopathic thrombocytopenia purpura, anxiety attacks, irritable bowel, disc impingement, bulging disks, degenerative disc disease, arthritis, a left sprained ankle, skin cancer, and acromioclavicular joint arthritis. AR 61; 63; 122; 148. The Commissioner denied Hanneman's claim initially on December 5, 2008, and again upon reconsideration on January 14, 2009. AR 63; 70-71. Hanneman requested an administrative hearing on January 27, 2009. AR 72-76.

Hanneman received a hearing before ALJ Maxwell on May 18, 2010. AR 13; 23-60. Finding no reason to reconsider his previous determination that Hanneman was not disabled during the time period of September 9, 1998 to July 21, 2003, the ALJ applied the doctrine of res judicata to the portion of Hanneman's claim seeking SSDI benefits from December 28, 1999 through July 21, 2003. Because Hanneman last met the insured status requirement of the Social Security Act on June 30, 2004, the ALJ determined that the time period relevant to Hanneman's claim for disability ran from July 21, 2003 to the date last insured.[3] AR 13. The ALJ issued a "Notice of Decision—Unfavorable" on June 23, 2010. AR 10-12. Hanneman appealed the ALJ's decision to the Appeals Council and submitted additional evidence including medical records and a medical source statement dating from October 26, 1998 to August 23, 2002. AR 1-4; 116; 840-74. The Appeals Council considered this evidence but denied Hanneman's request

---

[3] "An applicant must be insured for disability insurance benefits to be eligible for [Social Security Disability Insurance] benefits." Shaw v. Chater, 221 F.3d 126, 131 (2nd Cir. 2000). An applicant's insured status is determined based on whether the applicant has acquired sufficient quarters of coverage.

2

for review on July 26, 2011. Hanneman then timely filed her Complaint in this case on August 16, 2011. Doc. 1.

## II. Factual Background

Hanneman was born on December 15, 1957. AR 29; 122. She graduated from high school in 1976, and completed a certified nursing assistant program in the early eighties. AR 30;158-159. Hanneman currently lives in Madison, South Dakota with her husband. AR 29.

Dr. James Eckhoff, M.D. is Hanneman's treating rheumatologist. Hanneman began seeing Dr. Eckhoff regularly in October of 1998, when Dr. Eckhoff's impression was that Hanneman suffered from fibromyalgia and impingement syndrome in her left shoulder. AR 871-873. Dr. Eckhoff treated Hanneman's impingement syndrome with a corticosteroid shot. AR 873.

Hanneman had a follow-up visit with Dr. Eckhoff in January of 1999, during which she complained of persistent pain in her left shoulder. AR 870. Dr. Eckhoff noted "definite fibromyalgia which continues to fluctuate in symptoms" and continued impingement syndrome in Hanneman's left shoulder. AR 870. Hanneman met with Dr. Walker Wynkoop, M.D., an associate of Dr. Eckhoff, that same month. Dr. Wynkoop's impressions from this appointment were shoulder subacromial impingement and rotator cuff tendinitis. AR 840. Hanneman saw Carol Larsen, Dr. Eckhoff's physician's assistant ("P.A."), on March 2, 1999. AR 867-868. P.A. Larsen's exam of Hanneman revealed fibromyalgia tender points and positive subacromial impingement in the left shoulder. AR 867.

Hanneman was diagnosed with breast cancer in November of 1999, and did not see Dr. Eckhoff again until September 8, 2000. AR 865. During this appointment, Dr. Eckhoff remarked that Hanneman's fibromyalgia symptoms were moderately well controlled and noted impingement syndrome in Hanneman's left shoulder. AR 865-66. Hanneman saw Dr. Eckhoff

3

again in March of 2001. AR 859. Dr. Eckhoff noted that Hanneman's fibromyalgia was "symptomatic" in that it affected Hanneman's sleep and caused her diffuse muscle pain. AR 859. Dr. Eckhoff also listed impingement syndrome in Hanneman's left shoulder as a problem. Id.

Hanneman saw Dr. Eckhoff again in October of 2001. AR 857-58. Dr. Eckhoff assessed Hanneman as having fibromyalgia and impingement syndrome in her right shoulder. Dr. Eckhoff further remarked that a June 2001 MRI showed "bilateral shoulder joint changes" that suggested a "degenerative process," and that a July 2, 2001 MRI of Hanneman's cervical spine showed straightening of the cervical lordosis related to muscle spasms and mild spondylotic degenerative disc changes of C5-6. AR 857. In an October 25, 2001 note, Dr. Eckhoff restricted Hanneman to lifting no more than twenty pounds and opined that Hanneman could not sit or stand in one position for longer than fifteen minutes. AR 856.

At Dr. Eckhoff's suggestion, Hanneman saw Dr. Kathryn Florio, a neurologist, on November 6, 2001. AR 844. Hanneman complained of pain in her neck and shoulder and of numbness and tingling in her arms and legs. AR 843. Hanneman had a positive Tinel's sign at the left wrist.[4] AR 844. Dr. Florio's neurological exam revealed a mild abnormality of sensation with some evidence of a hysterical component. Id. Hanneman reported to Dr. Florio again on January 9, 2002 to undergo electrodiagnostic testing for weakness in her lower extremities. AR 842. The electrodiagnostic test showed "very minimal" abnormalities that were suggestive of bilateral S1 nerve root dysfunction, but was otherwise normal. Id. Dr. Florio found no neurological explanation for Hanneman's symptoms and referred her back to Dr. Eckhoff for continued care. AR 842.

---

[4] The Tinel's test and Phalen's maneuver are both commonly used to detect carpal tunnel syndrome. See WebMD.com, Carpal Tunnel Syndrome, http:www.webmc.com/pain-management/carpa-tunnel/carpal-tunnel-syndrome?page=2 (last visited May 10, 2012).

4

The next time Hanneman saw Dr. Eckhoff was in March of 2002. AR 853-54. Dr. Eckhoff's impressions were that Hanneman had "definite fibromyalgia" and impingement syndrome in her right shoulder, but that these symptoms improved when Hanneman used Vioxx. Dr. Eckhoff stated that Hanneman would probably not be able to return to the "vigorous" work she did as a nursing assistant. AR 854. As part of her treatment, Dr. Eckhoff recommended that Hanneman resume exercising as soon as the weather permitted. Id.

In a follow-up visit with Dr. Eckhoff on July 19, 2002, Hanneman complained of severe chest pain up to the right arm and into the right neck, and of pain at the base of the right thumb which became aggravated when she used her hand with a forceful grip or in a repetitive activity. AR 850. Dr. Eckhoff examined Hanneman for carpal tunnel syndrome[5] and found that she had a positive Tinel's test and Phalen's maneuver on the right and a positive Tinel's test and equivocal Phalen's maneuver on the left. Hanneman also had a positive Adson's maneuver, a test for thoracic outlet syndrome.[6]   See Mayo Clinic, Thoracic Outlet Syndrome, http://www.mayoclinic.com/health/thoracic-outlet-syndrome/DS00800/DSECTION=tests-and-diagnosis (last visited May 10, 2012). During the July 19, 2002 appointment, Hanneman asked Dr. Eckhoff how she should proceed with a disability application. AR 852. Dr. Eckhoff's notes explain that "I have indicated to her that I don't consider fibromyalgia to be a disabling condition,

---

[5] "Carpal tunnel syndrome occurs when the median nerve becomes pinched due to swelling of the nerve or tendons or both. The median nerve provides sensation to the palm side of the thumb, index, middle fingers, as well as the inside half of the ring finger and muscle power to the thumb. When this nerve becomes pinched, numbness, tingling, and sometimes pain of the affected fingers and hand may occur and radiate into the forearm." WebMD.com, http://www.webmd.com/pain-management/carpal-tunnel/carpal-tunnel-syndrome (last visited May 10, 2012).

[6] "Thoracic outlet syndrome is a group of disorders that occur when the blood vessels or nerves in the thoracic outlet—the space between [the] collarbone and [the] first rib—become compressed. This can cause pain in [the] shoulders and neck and numbness in [the] fingers." Mayo Clinic, Thoracic Outlet Syndrome, http://www.mayoclinic.com/health/thoracic-outlet-syndrome/DS00800 (last visited May 10, 2012).

but she does have problems with thoracic outlet, she does have evidence of carpal tunnel syndrome, and 1st CMC joint disease causing pain and discomfort with the use of her thumb. I think that she should be restricted from repetitive heavy work. Moreover with the thumb the way it is, she can't be using her hands for forceful grip or other activities of a repetitive nature." AR 852. Dr. Eckhoff made a number of recommendations in regard to treatment, including a column thumb splint and a visit to Dr. Florio for a nerve conduction velocity test to evaluate Hanneman for carpel tunnel syndrome. AR 852. The nerve conduction velocity test took place on August 2, 2002, and showed mild median nerve entrapment at the right wrist with no evidence of median nerve entrapment at the left wrist. AR 841.

On August 23, 2002, Hanneman returned to Dr. Eckhoff and requested that he fill out a residual functional capacity assessment for her Social Security Disability application. AR 519. In his notes from this appointment, Dr. Eckhoff states:

> The [residual functional capacity assessment form] asks about the diagnosis of impairment. This has not been done. She does have mild carpal tunnel syndrome on the right and impingement syndrome on the right shoulder.   The carpal tunnel syndrome is expected to be intermittently symptomatic and to be improved with the use of wrist splinting and decreased repetitive activities with that hand. Shoulder symptoms will fluctuate depending on how much stress and strain she puts upon the shoulder with reaching overhead.

AR 520. Dr. Eckhoff's notes go on to explain that Hanneman has certain postural limitations, should alternate between sitting and standing to relieve discomfort, may stand less than two hours in an eight-hour workday, can occasionally lift twenty pounds, and can frequently lift less than ten pounds. AR 520. In support of these limitations, Dr. Eckhoff pointed to Hanneman's statements that inactivity and prolonged activity aggravated her muscular pain, and that crouching or squatting for long periods of time causes numbness in her legs. AR 520; 847. Dr. Eckhoff further stated that he again told Hanneman that he did not consider fibromyalgia to be

a disabling disease, and noted that "[Hanneman] has not been able to do the things that need to be done." AR 520. Dr. Eckhoff told Hanneman that if they were not making any progress on her symptoms, Hanneman should consider seeing a psychologist to determine whether there was some psychological overlay that was contributing to Hanneman's symptoms. Id. Dr. Eckhoff also suggested the possibility of enrolling in a chronic pain program and encouraged Hanneman to exercise more regularly. AR 520. Although the residual functional capacity assessment form that Dr. Eckhoff completed during the August 23, 2002 appointment was not part of the administrative record at the time of Hanneman's hearing, Hanneman submitted the form when she appealed her case to the Appeals Council. AR 845-48; 876. The limitations Dr. Eckhoff listed in the form were substantially the same as those he listed in his treatment notes from that day.

Hanneman next saw Dr. Eckhoff on January 15, 2003, when Dr. Eckhoff again identified fibromyalgia tender points on Hanneman. AR 515-16. Dr. Eckhoff's impressions from this appointment were that Hanneman suffered from persistent fibromyalgia and intermittent depression. AR 516. Dr. Eckhoff prescribed to Hanneman the antidepressant Wellbutrin. Id.

Hanneman returned to Dr. Eckhoff on April 23, 2003. AR 514. Dr. Eckhoff's examination of Hanneman revealed fibromyalgia tender points. Id. Hanneman's chest wall examination showed "marked tenderness on the ribs and moderate tenderness between them over the left 9th through the 12th ribs adjacent to the spine." Id. Dr. Eckhoff's notes state that Hanneman "is going to see Dr. Hoversten I believe regarding the chest wall pain. If this workup is negative, we should probable [sic] proceed to chest or lung CT, an MRI or a bone scan in that order. Presently I do not know what is causing the pain or discomfort. It is certainly not due to fibromyalgia." AR 514.

7

Hanneman saw Dr. Eckhoff again on August 26, 2003. AR 511. Under the "impression" section of his notes detailing this appointment, Dr. Eckhoff stated "carpel tunnel symptoms right greater than left, definite fibromyalgia with tender points and trigger points reproducing carpal tunnel symptoms as well, strong suspicion of seasonal affective disorder." AR 511. Dr. Eckhoff strongly recommended that Hanneman engage in regular exercise, ordered a trial of seasonal affective disorder lights, and scheduled Hanneman for a recheck in six months. AR 511.

At a checkup on March 16, 2004, Hanneman again had fibromyalgia tender points. AR 507. Dr. Eckhoff's impressions included fibromyalgia with symptoms that fluctuate and possible seasonal affective disorder. AR 507. Dr. Eckhoff continued Hanneman on her current medications and recommended a follow-up appointment in one year. AR 507. Hanneman followed Dr. Eckhoff's recommendation and saw him again on March 22, 2005, when she complained of having severe pain in her lower back and right upper extremity. AR 503. Hanneman had gone to the emergency room on February 22, 2005, for these same problems. AR 409-413; 503. Although her back pain had improved by March 22, 2005, Hanneman reported ongoing arm pain. AR 503. Dr. Eckhoff's examination of Hanneman's hands showed "fixed hypesthesia[7] at the right hand in the median nerve distribution that has negative Tinel's signs on both sides and a negative Phalen's maneuver on the left." AR 504. Dr. Eckhoff also noted that "Hudson's maneuvers are positive on the right side which is possibly raising the issue of brachial plexus neuritis."[8] Dr. Eckhoff referred Hanneman to Dr. Florio for an evaluation of possible brachial plexus neuritis. AR 504. Hanneman met with Dr. Florio on March 29, 2005. AR 685.

---

[7] Stedman's Medical Dictionary defines hypesthesia as "diminished sensitivity to stimulation." Stedman's Medical Dictionary 929 (28th ed. 2006).

[8] Brachial Plexus Neuritis, or Parsonage-Turner syndrome, is a condition "characterized by inflamation of the network of nerves that control and supply the muscles of the chest, shoulders, and arms." WebMd.com, http://children.webmd.com/parsonage-turner-syndrome (last visited May 10, 2012).

8

Hanneman complained of right hand and arm numbness with weakness and burning dysesthesias. Id. Dr. Florio performed an electrodiagnostic test which demonstrated a mild median nerve entrapment at the right wrist and a mild to severe axonal degeneration in multiple muscles in the right arm. AR 686.

On April 16, 2005, Dr. Patrick Kelly performed a right anterior scalenectomy, or thoracic outlet decompression, on Hanneman due to numbness and tingling in her hand and "significant arteriovenous compromise." AR 255-56. By November 10, 2005, Hanneman was described as doing fine from "the perspective of thoracic outlet decompression." AR 271. Hanneman reported that she still had a significant amount of pain in her right arm and chest and numbness in her left fingers, however. AR 272.

On July 28, 2005, Hanneman saw Dr. Florio for upper extremity numbness and weakness. AR 666. In a letter to Dr. Kelly discussing Hanneman's appointment, Dr. Florio explained that when she saw Hanneman initially in November of 2001, Dr. Florio could not find any explanation for Hanneman's upper extremity numbness and weakness. Dr. Florio noted, however, that a March 2005 MRI of Hanneman's cervical spine showed a herniated disk at C5-C6, and a smaller herniated disc at C6-C7. Id. These abnormalities were not present in Hanneman's 2001 MRI. Id. Dr. Florio noted that Hanneman said she was having symptoms in both of her arms and reported severe shock-like pain in her right arm, as well as swelling, and color and temperature changes of the arm. AR 666. In Dr. Florio's opinion, the right arm had "the flavor of RSD."[9] AR 666. In regard to the left arm, Dr. Florio planned to review Hanneman's cervical MRI and to give Hanneman a left upper-extremity EMG. AR 667. Hanneman saw Dr. Florio again on September 6, 2005. Dr. Florio concluded that Hanneman's

---

[9] "RSD," or reflex sympathetic dystrophy, is "a rare disorder of the sympathetic nervous system that is characterized by chronic, sever pain." WebMD.com, Reflex Sympathetic Dystrophy Syndrome, http://www.webmd/brain/reflex-sympathetic-dystrophy-syndrome (last visited April 14, 2012).

9

enlarged herniated disk at C5-C6 was causing Hanneman's symptoms in her left upper extremity, and that Hanneman's right upper-extremity symptoms were the result of RSD. AR 665. To treat the RSD, Dr. Florio recommended physical therapy, increased Hanneman's Neurotonin dosage, and prescribed Pamelor to help Hanneman's RSD-related anxiety and depression. Id. Dr. Florio felt that the herniated disk would likely require surgery, but that Hanneman was not "capable physically or emotionally" of undergoing surgery at that time. Id.

Hanneman continued to see Dr. Eckhoff for fibromyalgia, impingement syndrome, and other issues through the time of the hearing in 2010. AR 481-500; 713-15. On May 14, 2010, Dr. Eckhoff completed a second form concerning Hanneman's limitations. AR 837-39. Dr. Eckhoff found that Hanneman could occasionally lift ten pounds and frequently lift less than ten pounds. AR 837. Dr. Eckhoff concluded that Hanneman could stand and/or walk for less than two hours in an eight-hour workday and that Hanneman would have to alternate between sitting and standing to relieve her discomfort. Id. Dr. Eckhoff further noted that Hanneman was to avoid repetitive use of her upper and lower extremities and that this limited her ability to push and/or pull. Dr. Eckhoff also identified several other restrictions, including Hanneman's inability to assume certain postural positions and her limitations when reaching, handling, and fingering. AR 838-39. The questionnaire included in the administrative record did not ask Dr. Eckhoff to specify during what time period Hanneman had any of the above-noted limitations. Nor did Dr. Eckhoff do so. AR 837-839. In addition to the questionnaire from Dr. Eckhoff, the administrative record contains a September 5, 2008 letter from Dr. Michael Keppen, Hanneman's treating oncologist, that discusses Hanneman's limitations. AR 536. Dr. Keppen stated that

10

Hanneman has not been able to work since 1999 and has fibromyalgia, RSD of the right upper extremity, and a herniated disk in the cervical spine C5 and C6 with radiculopathy. Id. [10]

Hanneman's hearing before the ALJ occurred on May 18, 2010, in Sioux Falls. AR 23. Present at the hearing were Hanneman and her attorney, Renee Christensen, as well as Richard Ostrander, a vocational expert summoned to the hearing by the ALJ. AR 25.[11]

Hanneman testified that she started seeing Dr. Eckhoff for her fibromyalgia after she began having troubles at work. AR 35. Hanneman said her fibromyalgia comes and goes and described it "as a migratory disease because it'll effect you all of a sudden in one area and then you get ceased up and then it'll quit for a while and then it'll start up. You never know where it's going to . . ." AR 36. Hanneman testified that she stopped working in 1999 after she was diagnosed with breast cancer and had a mastectomy with ensuing complications. AR 33; 55. Hanneman had trouble using her right arm after the mastectomy and believed that the surgeon had "cut through a lot of tissue and nerves and whatnot." AR 34-35; 52. Hanneman testified that since the surgery she has had "pinpricks going through my hands all the time" and numbness in her chest wall cavity. AR 46. Hanneman listed her medications as Neurotonin for her RSD and fibromyalgia, Alprazolam for anxiety, Triamterene -HCT for fluids, Prevacid for reflux, Flexeril

---

[10] Dr. Keppen began treating Hanneman in March of 2008, after Dr. Loren Tschetter, Hanneman's treating oncologist from 2000 to 2007, retired. AR 544; 547-48. Dr. Keppen's treatment notes contain references to Hanneman's chronic pain, RSD, and fibromyalgia. AR 539; 541; 544. The treatment notes from Dr. Tschetter's cancer-screening examinations contain similar references, including statements regarding Hanneman's fibromyalgia during and around the time period for which she is now seeking benefits. AR 571; 569; 567; 565; 562.

[11] At the beginning of the hearing, the ALJ made clear what the relevant time period was—July 21, 2003, the date of his prior ruling, to June 30, 2004. AR 28. Both the ALJ and Hanneman's attorney attempted to keep Hanneman focused on discussing her symptoms and limitations as they related to this time period, but Hanneman struggled to do so. AR 38; 39; 41-42; 45-46.

for muscle relaxation, Remifemin for hot flashes, and Ibuprofen for pain. AR 39. Hanneman believed that she was taking all of these medications in June of 2004. Id.

When asked about her limitations in June of 2004, Hanneman explained that her fibromyalgia made it difficult to stay in one position for very long. AR 41. Hanneman estimated that she could sit for between two and four hours and stand for a "couple hours." AR 41-44. Hanneman said that she walks on a flat treadmill at 2.8 miles an hour for ten minutes at a time and that, depending on how she feels, she repeats this activity up to three times a day. AR 44. Hanneman testified that she could probably lift, carry, pull, and push ten pounds. AR 45. Hanneman's testimony also indicated that she had at least some difficulty reaching overhead during the time period relevant to her disability claim. AR 46. When asked by the ALJ whether Dr. Eckhoff ever limited her activities prior to June of 2004, Hanneman said that Dr. Eckhoff told her to avoid kneeling, crouching, climbing ladders, bending over, and standing too long. When the ALJ again asked Hanneman when Dr. Eckhoff had imposed these limitations, Hanneman said "Well, I'm, I can't remember the dates but I, he has told me that these things will irritate it." AR 57.

At one point during the hearing, Hanneman stated "they've been telling me now that both of my hips got to be replaced because the arthritis [is] so bad." AR 37. During later questioning by the ALJ, Hanneman persisted in this statement and said that doctors from the Orthopedic Institute had told her this. AR 57-58. The ALJ noted that the medical records showed that Hanneman only had mild osteoarthritis in her hips and expressed confusion over how this condition would require a hip replacement. AR 58. The ALJ's questions prompted the following exchange:

> Hanneman: Well, that, sir, what he told me, he said in time if they get worse . . ."
> ALJ: All right, in time if you get, if you get worse you might need a hip replacement.

12

Hanneman: Correct.
ALJ: So if you, if you stated earlier that you've been told you need a
total hip replacement that would be wrong at this point would it not?
Hanneman: Well, what I meant was that in time I . . ."
ALJ: All right.
Hanneman: I'm correcting myself.

AR 58-59. Because neither the ALJ nor Hanneman's attorney had questions for him, the

vocational expert did not testify. AR 59.

### III. The Disability Determination and the Five-Step Procedure

To determine whether Plaintiff was disabled, the ALJ applied the five-step sequential

evaluation process mandated under 20 C.F.R. § 404.1520(a)(4). Under this five-step analysis,

an ALJ is required to examine:

> (1) whether the claimant is currently engaged in a "substantial gainful
> activity;"
> (2) whether the claimant has a severe impairment–one that significantly
> limits the claimant's physical or mental ability to perform basic work
> activities;
> (3) whether the claimant has an impairment that meets or equals a
> presumptively disabling impairment contained in the listing of impairments
> (if so, the claimant is disabled without regard to age, education, and work
> experience);
> (4) whether the claimant has the residual functional capacity to perform his
> or her past relevant work; and
> (5) if the claimant cannot perform the past work, the burden shifts to the
> Commissioner to prove that there are other jobs in the national economy that
> the claimant can perform.

Baker v. Apfel, 159 F.3d 1140, 1143-44 (8th Cir. 1998). If the ALJ can make a conclusive

disability determination before step five, the applicable regulation requires the ALJ to make that

determination and not proceed to the next step. 20 C.F.R. § 404.1520(a)(4). If the ALJ cannot

make such a determination before step five, the ALJ must evaluate each step. Id. Between steps

three and four, the ALJ assesses the claimant's residual functional capacity ("RFC"). Id.

At step one, the ALJ found that Hanneman had not engaged in substantial gainful activity

during the relevant time period of July 21, 2003 to June 30, 2004. AR 16-17. At step two, the

13

ALJ found that Hanneman's history of breast cancer and fibromyalgia were medically determinable impairments, but that these impairments were not "severe" within the meaning of the applicable regulations. AR 17. Because the ALJ found that Hanneman did not have any severe impairments, he ended the sequential evaluation at step two. AR 17; 22.

## IV. Standard of Review

When considering an ALJ's denial of Social Security benefits, a district court must determine whether the ALJ's decision "complies with the relevant legal requirements and is supported by substantial evidence as a whole." Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009) (quoting Ford v. Astrue, 518 F.3d 979, 981 (8th Cir. 2008)). Where, as in the present case, the Appeals Council considers new evidence but denies review, a district court "must determine whether the ALJ's decision was supported by substantial evidence on the record as a whole, including the new evidence."[12]   Davidson v. Astrue, 501 F.3d 987, 990 (8th Cir. 2007).

---

[12] The newly submitted evidence in this case consists of the following:  1) Medical records from Dr. Florio, Hanneman's treating neurologist, dating from November 6, 2001 to August 2, 2002 (AR 841-844); 2) a medical record from Central Plains Clinic-Orthopedics dated January 26, 1999 (AR 840); 3) a medical source statement from Hanneman's treating rheumatologist, Dr. Eckhoff, dated August 23, 2002 (AR 845-48); and 4) medical records from Dr. Eckhoff from October 26, 1998 to August 23, 2002 (AR 849-874).  In his February 3, 2011 brief to the Appeals Council, Hanneman's attorney listed these four exhibits as attachments to his brief. AR 116.  In its July 26, 2011 order denying review of Hanneman's case, the Appeals Council stated "In looking at your case, we considered the reasons you disagree with the decision in the material listed on the enclosed Order of Appeals Council.  We found that this information does not provide a basis for Changing the Administrative Law Judge's decision."  AR 1-2.  The Order of Appeals Council accompanying the Appeals Council's decision only listed Hanneman's attorney's brief as additional evidence which the appeals council was making part of the record, however. AR 4.  The Order did not list any of the above-noted exhibits. Id.  In Cunningham v. Apfel, 222 F.3d 496, 500 (8th Cir. 2000), the Eighth Circuit Court of Appeals explained the effect of new evidence submitted to the Appeals Council for a reviewing court:

> The regulations provide that the Appeals Council must evaluate the entire record, including any new and material evidence that relates to the period before the date of the ALJ's decision. See Nelson v. Sullivan, 966 F.2d 363, 366 (8th Cir. 1992). If the Appeals Council finds that the ALJ's actions, findings, or conclusions are contrary to the weight of the evidence, including the new evidence, it will review the

"Substantial evidence on the record as a whole" entails "a more scrutinizing analysis" than "substantial evidence," which is merely such relevant evidence that a "reasonable mind might accept as adequate to support a conclusion." Burress v. Apfel, 141 F.3d 875, 878 (8th Cir. 1998) (noting that "it is not sufficient for the district court to simply say there exists substantial evidence supporting the Commissioner.") (internal quotation omitted). "The findings of the Commissioner as to any fact, if supported by substantial evidence, shall be conclusive . . . ." 42 U.S.C. § 405(g). "Substantial evidence is "less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." Pate-Fires, 564 F.3d at 942 (quoting Maresh v. Barnhart, 438 F.3d 897, 898 (8th Cir. 2006)). "Substantial evidence means more than a mere scintilla." Slusser v. Astrue, 557 F.3d 923, 925 (8th Cir. 2009) (citing Neal v. Barnhart, 405 F.3d 685, 688 (8th Cir. 2005)). A district court must "consider both evidence that supports and evidence that detracts from the Commissioner's decision." Pate-Fires, 564 F.3d at 942 (citations omitted). Additionally, "[a]s long as substantial evidence in the record supports the Commissioner's decision, [the court] may not reverse it because substantial evidence exists in the record that would have supported a contrary outcome, or because [the

---

case. See 20 C.F.R. § 404.970(b). Here the Appeals Council denied review, finding that the new evidence was either not material or did not detract from the ALJ's conclusion. In these circumstances, we do not evaluate the Appeals Council's decision to deny review, but rather we determine whether the record as a whole, including the new evidence, supports the ALJ's determination.

see also Riley v. Shalala, 18 F.3d 619, 622 (8th Cir. 1994) ("Once it is clear that the Appeals Council has considered newly submitted evidence, we do not evaluate the Appeals Council's decision to deny review. Instead, our role is limited to deciding whether the administrative law judge's determination is supported by substantial evidence on the record as a whole, including the new evidence submitted after the determination was made."); Nelson v. Sullivan, 966 F.2d 363, 366 (8th Cir. 1992) ("If the Appeals Council does not consider the new evidence, a reviewing court may remand the case to the Appeals Council if the evidence is new and material. If, as here, the Appeals Council considers the new evidence but declines to review the case, we review the ALJ's decision and determine whether there is substantial evidence in the administrative record, which now includes the new evidence, to support the ALJ's decision.").

court] would have decided the case differently." McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000) (internal citations omitted).

The Court also reviews the Commissioner's decision to determine if appropriate legal standards were applied. See Roberson v. Astrue, 481 F.3d 1020, 1022 (8th Cir. 2007). The district court reviews de novo the ALJ's ruling for any legal errors. Brueggemann v. Barnhart, 348 F.3d 689, 692 (8th Cir. 2003).

**V. Discussion**

Hanneman argues that the ALJ's decision is not supported by substantial evidence on the record as a whole and free of legal error. She raises one main issue and four sub-issues on appeal:

> 1. Whether the Commissioner erred in concluding that Hanneman did not have a "severe" impairment and ending the sequential evaluation at Step Two;
> a. Whether the Commissioner erred when he failed to determine that Hanneman's fibromyalgia was severe;
> b. Whether the Commissioner erred when he failed to identify Hanneman's medically determinable impairments of impingement syndrome and carpal tunnel and determine their severity;
> c. Whether the Commissioner improperly evaluated the medical evidence from the treating physicians;
> d. Whether the Commissioner erred by failing to properly evaluate Hanneman's subjective complaints of pain and other symptoms.

Doc. 11 at 1. At the outset of considering these issues, it is necessary to address the issue of res judicata. Hanneman contends that the ALJ's application of res judicata to the portion of her claim predating July 21, 2003, was done without providing her proper notice and a meaningful opportunity to address the issue, without support of substantial evidence, and was a violation of her due process rights. Doc. 1. The Commissioner asserts that the ALJ's finding concerning the time period relevant to this case was proper, that Hanneman's arguments on appeal rely primarily

16

on evidence from outside the relevant time period, and that evidence from before July 21, 2003, cannot serve as a basis to reopen Hanneman's prior disability claim. Doc. 17 at 10-11.

The United States Court of Appeals for the Eighth Circuit has explained that "[r]es judicata bars subsequent applications for [SSDI benefits] based on the same facts and issues the Commissioner previously found to be insufficient to prove the claimant was disabled. If res judicata applies, the medical evidence from the initial proceeding cannot be subsequently reevaluated." Hillier v. Soc. Sec. Admin., 486 F.3d 359, 364-365 (8th Cir. 2007) (internal citations and quotations omitted). In the present case, however, Hanneman does not attempt to reopen the ALJ's July 21, 2003 decision. Doc. 18 at 2.[13] Instead, Hanneman is claiming that the medical evidence considered in the July 21, 2003 decision establishes that she had multiple severe impairments during the time period relevant to this case. Medical evidence that predates a claimant's alleged onset of disability date is not categorically irrelevant to a finding of a severe impairment. See Groves v. Apfel, 148 F.3d 809, 810-11 (7th Cir. 1998) ("There thus is no absolute bar to the admission in the second proceeding of evidence that had been introduced in the prior proceeding yet had not persuaded the agency to award benefits. The 'readmission' of that evidence is barred only if a finding entitled to collateral estoppel effect establishes that the evidence provides no support for the current claim."); Smith v. Astrue, No. 09-CV-3065, 2011 WL 1230327, at *3 n.8 (N.D. Iowa Mar. 30, 2011); see also Cox v. Barnhart, 471 F.3d 902, 907 (8th Cir. 2006) ("Evidence from outside the insured period can be used in 'helping to elucidate a medical condition during the time for which benefits might be rewarded.'") (quoting Pyland v. Apfel, 149 F.3d 873, 877 (8th Cir. 1998)).

---

[13] Specifically, Hanneman's brief states "Dori did not argue that the prior decision be reopened, but rather that the evidence from the prior decision shows she had multiple severe impairments, at least as of 7/21/03, the day prior to the relevant period in this case." Doc. 18 at 2.

17

Here, the discrepancy between the ALJ's July 21, 2003 decision and his June 23, 2010 decision makes the evidence predating the ALJ's first decision particularly relevant. In his July 21, 2003 decision, the ALJ found that the combination of Hanneman's impairments were "severe" within the meaning of the Social Security Act. Doc. 18-1 at 6. In his June 23, 2010 decision, however, the ALJ found that as of July 22, 2003, and continuing on through June 30, 2004, Hanneman did not suffer from any severe impairment. AR 17. It is therefore appropriate to consider the medical evidence predating the July 21, 2003 decision in an attempt to reconcile the discrepancy in the ALJ's two decisions.[14]

## A. Severe Impairments

Hanneman argues that the ALJ erred in failing to find that her fibromyalgia was a severe impairment and in failing to identify her impairments of impingement syndrome and carpal tunnel syndrome and determine their severity. At step two of the sequential evaluation process, it is Hanneman's burden to establish that her impairments or combination of impairments are severe. Kirby v. Astrue, 500 F.3d 705, 707 (8th Cir. 2007). "Severity is not an onerous requirement for the claimant to meet, but it is also not a toothless requirement[.]" Id. An impairment is "severe" if it "significantly limits [an individual's] physical or mental ability to do basic work activities." 20 C.F.R. 404.1520(c). Basic work activities means "the abilities and

---

[14] The administrative record also contains plenty of medical evidence that postdates the time period relevant to this case. Such evidence may be used to "'elucidate a medical condition during the time for which benefits might be rewarded.'" Cox v. Barnhart, 471 F.3d 902, 907 (8th Cir. 2006)(quoting Pyland v. Apfel, 149 F.3d 873, 877 (8th Cir. 1998)). The relevance of evidence postdating the time period for which benefits are sought has its limits, however. See Davidson v. Astrue, 501 F.3d 987, 989 (8th Cir. 2007) ("'When an individual is no longer insured for Title II disability purposes, we will only consider her medical condition as of the date she was last insured.'") (internal marks omitted) (quoting Long v. Chater, 108 F.3d 185, 187 (8th Cir. 1997)); Brown v. Barnhart, 390 F.3d 535, 540 (8th Cir. 2004) (claimant's diagnosis of coronary artery disease one year after her insured status expired had "no bearing" in her case).

aptitudes necessary to do most jobs." 20 C.F.R. § 404.1521(b). These abilities and aptitudes

include physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching,

carrying, or handling; capacities for seeing, hearing, and speaking; understanding, carrying out

and remembering simple instructions; using judgment; responding appropriately to supervision,

co-workers, and usual work situations; and dealing with changes in a routine work setting. 20

C.F.R. §§ 404.1521(b)(1)-(6).

     "An impairment is not severe if it amounts only to a slight abnormality that would not

significantly limit the claimant's physical or mental ability to do basic work activities." Kirby,

500 F.3d at 707. "The sequential evaluation process may be terminated at step two only when

the claimant's impairment or combination of impairments would have no more than a minimal

impact on her ability to work." Page v. Astrue, 484 F.3d 1040, 1043 (8th Cir. 2007) (quoting

Caviness v. Massanari, 250 F.3d 603, 605 (8th Cir. 2001)). Social Security Ruling 85-28

cautions:

> Great care should be exercised in applying the not severe impairment
> concept. If an adjudicator is unable to determine clearly the effect of
> an impairment or combination of impairments on the individual's ability
> to do basic work activities, the sequential evaluation process should not
> end with the not severe evaluation step. Rather, it should be continued.
> In such a circumstance, if the impairment does not meet or equal the
> severity level of the relevant medical listing, sequential evaluation
> requires that the adjudicator evaluate the individual's ability to do past
> work, or to do other work based on the consideration of age, education,
> and prior work experience.

1985 WL 56856, at *4 (1985); see also Gilbert v. Apfel, 175 F.3d 602, 605 (8th Cir. 1999)

(referring to Social Security ruling 85-28 as a "cautious standard.").

In his June 23, 2010 decision, the ALJ did not include carpal tunnel syndrome or impingement syndrome in his listing of Hanneman's medically determinable impairments.[15] The medical evidence before the ALJ at the time of the May 18, 2010 hearing explicitly discussed Hanneman's carpal tunnel syndrome and impingement syndrome. In his notes from an August 23, 2002 appointment, Dr. Eckhoff stated that Hanneman has "mild carpal tunnel syndrome on the right and impingement syndrome on the right shoulder. The carpal tunnel syndrome is expected to be intermittently symptomatic and to be improved with the use of wrist splinting and decreased repetitive activities with that hand. Shoulder symptoms will fluctuate depending upon how much stress and strain she puts upon the shoulder with reaching overhead." AR 520. Dr. Eckhoff's examination of Hanneman on August 26, 2003, showed positive carpal tunnel maneuvers on the right and equivocal on the left. AR 511. In addition, Hanneman's medical records postdating the August of 2002 appointment with Dr. Eckhoff show that Hanneman's impingement syndrome was an ongoing problem through June 30, 2004, the date Hanneman last met the insured status requirement. AR 511; 515; 514; 507.

The Commissioner, relying on Raney v. Barnhart, 396 F.3d 1007, 1011 (8th Cir. 2005), argues that the ALJ did not err by failing to identify Hanneman's carpal tunnel and impingement syndromes as medically determinable impairments. Doc. 17 at 14. At issue in Raney, however, was whether the ALJ, after having found that the claimant suffered from severe medical impairments, failed to consider the claimant's impairments in combination. 396 F.3d at 1011. In Raney, unlike here, the ALJ listed all of the claimant's impairments. Id. Although ALJs are not required to discuss every piece of evidence in the record, see Weber v. Apfel, 164 F.3d 431,

---

[15] A medically determinable impairment is one that "results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3).

20

432 (8th Cir. 1999), ALJs must "articulate, at some minimum level, [their] analysis of the evidence . . . [and] provide some glimpse into [their] reasoning." Dixon v. Massanari, 270 F.3d 1171, 1176 (7th Cir. 2001). Here, the ALJ failed to do so with respect to the evidence of carpal tunnel and impingement syndromes.

In his July 21, 2003 decision, the ALJ found that Hanneman had severe impairments in combination consisting of fibromyalgia, asymptomatic impingement syndrome of the right shoulder, Raynaud's syndrome, early carpal tunnel syndrome on the right, and chest wall or rib pain. Doc. 18-1 at 6. But the ALJ's June 23, 2010 decision did not include carpal tunnel syndrome or impingement syndrome in his listing of Hanneman's medically determinable impairments. The ALJ's June 23, 2010 decision contains only one brief reference to carpal tunnel syndrome and no mention at all of impingement syndrome. AR 13-22. The ALJ failed to explain any rationale for having found Hanneman to have severe impairments in the July 21, 2003 decision, but not to have severe impairments as of July 22, 2003. There may be some explanation for the apparent inconsistency, but the ALJ provided no such explanation and the record does not of itself reveal a ready rationale.

Hanneman's medical records from 1998 to 2002—the majority of which were not before the ALJ at the time of the May 18, 2010 hearing—document Hanneman's issues with impingement syndrome and carpal tunnel syndrome. During late 1998 and early 1999, Dr. Eckhoff diagnosed Hanneman as having impingement syndrome in her left shoulder, and Dr. Wynkoop and P.A. Larson found that Hanneman had subacromial impingement in her left shoulder. AR 873; 840; 867. Additional medical records from October of 1998 to 2001 list impingement syndrome of the left shoulder as being among Hanneman's problems. AR 870; 859; 863. In the Fall of 2001, Dr. Eckhoff assessed Hanneman as having impingement syndrome

21

of the right shoulder as well and noted bilateral shoulder joint changes that suggested a degenerative process. AR 857. In July of 2002, Dr. Eckhoff noted impingement syndrome in Hanneman's right shoulder and her problems with thoracic outlet syndrome. AR 850-852. A residual functional capacity assessment Dr. Eckhoff filled out on August 23, 2002, lists impingement syndrome in the right shoulder as one of Hanneman's impairments. AR 845.

Hanneman's issues with carpal tunnel syndrome are similarly well documented. Dr. Florio's November 6, 2001 examination of Hanneman revealed a positive Tinel's test in Hanneman's left wrist. AR 844. On July 19, 2002, Dr. Eckhoff examined Hanneman for carpel tunnel syndrome and found that she had a positive Tinel's test and Phalen's maneuver on the right and a positive Tinel's sign and equivocal Phalen's maneuver on the left. AR 851. Electrodiagnostic testing on August 2, 2002, showed that Hanneman had mild median nerve entrapment at the right wrist. AR 841. Dr. Eckhoff's residual functional capacity of Hanneman from August 23, 2002, lists mild carpal tunnel syndrome in the right wrist as one of Hanneman's impairments and states that Hanneman's carpal tunnel syndrome symptoms will fluctuate depending upon use and activity. AR 845.

Although the ALJ considered Hanneman's fibromyalgia, there is nothing in the ALJ's June 23, 2010 decision to support that Hanneman's impingement syndrome and carpal tunnel syndrome had improved to such an extent that they could be disregarded. Nor do Hanneman's medical records pertaining to July 21, 2003 to June 30, 2004 appear to support such a finding. This Court cannot tell whether the ALJ believed that her impingement and carpal tunnel syndromes had improved or mistakenly overlooked those issues in the second filing for SSDI benefits. Contrary to the Commissioner's assertion, the ALJ's statement that he gave "careful consideration" to the "entire record" does not, under the circumstances of this case, suffice to

22

excuse the ALJ's failure to discuss Hanneman's impingement syndrome and carpal tunnel syndrome, and to explain the inconsistency between his July 21, 2003 and June 23, 2010 decisions. See Salazar v. Barnhart, 468 F.3d 615, 622 (10th Cir. 2006) (finding that the ALJ's failure to consider claimant's borderline personality disorder documented in the record required a remand, even though the ALJ stated in his decision that he considered "all of the evidence in the record."); Draper v. Barnhart, 425 F.3d 1127, 1130 (8th Cir. 2005) ("While a deficiency in opinion-writing is not a sufficient reason to set aside an ALJ's finding where the deficiency has no practical effect on the outcome of the case, inaccuracies, incomplete analyses, and unresolved conflicts of evidence can serve as a basis for remand.") (internal marks and citations omitted).

The circumstances in this case preclude a finding that the ALJ's errors at Step Two are harmless. When the ALJ in 2003 considered Hanneman's carpal tunnel syndrome and impingement syndrome in combination with her fibromyalgia, chest wall or rib pain, and Raynaud's syndrome, he found that these impairments were severe in combination. Doc. 18-1 at 6. When the ALJ did not consider Hanneman's impingement syndrome or carpal tunnel syndrome, however, he found that she did not suffer from a severe impairment, either singly or in combination. Accordingly, this Court cannot say that the ALJ "would inevitably have reached the same result" had he not erred at Step Two. Dewey v. Astrue, 509 F.3d 447, 449-50 (8th Cir. 2007) (rejecting Commissioner's argument that ALJ's error was harmless where court could not say that, absent the ALJ's error, the ALJ would have "inevitably reached the same result.").

Because the ALJ failed to provide an adequate explanation of Hanneman's impairments and to explain the discrepancy between his two opinions, his opinion is not supported by

23

substantial evidence on the record as a whole. This Court remands the case to the ALJ for further consideration consistent with this Opinion and Order.[16]

## B. ALJ's Evaluation of Opinions From Treating Physicians and Hanneman's Subjective Complaints of Pain and Other Symptoms

Because this Court has determined that Hanneman's case must be remanded for a revaluation of the severity of her claimed impairments, this Court need not discuss many of Hanneman's remaining claims. Nevertheless, some additional discussion is warranted on Hanneman's contention that the ALJ erred in his evaluation of her treating physicians' opinions and her subjective complaints of pain and other symptoms.

When a treating physician's opinion is "well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record," an ALJ generally gives the opinion controlling weight. Teague v. Astrue, 638 F.3d 611, 615 (8th Cir. 2011) (quoting 20 C.F.R. § 404.1527(d)(2)). However, a treating physician's opinion "does not automatically control, since the record must be evaluated as a whole." Prosch v. Apfel, 201 F.3d 1010, 1012 (8th Cir. 2000) (citation and internal marks omitted). "An ALJ may discount or even disregard the opinion of a treating physician where other medical assessments are supported by better or more thorough medical evidence, or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions." Perkins v. Astrue, 648 F.3d 892, 897-98 (8th Cir. 2011) (citation omitted). "Whether the ALJ grants a treating physician's opinion substantial or little weight, the regulations provide

---

[16] Hanneman argues that her fibromyalgia is a severe impairment by itself. On remand, the ALJ will consider all of the evidence and will determine whether Hanneman's impairments constitute a severe impairment either singly or in combination. While it is certainly questionable whether Hanneman's fibromyalgia, standing alone, was a severe impairment during the relevant time period, the circumstances of this case make it appropriate for the ALJ to make this determination on remand.

that the ALJ must 'always give good reasons' for the particular weight given to a treating physician's evaluation." Prosch, 201 F.3d at 1013 (quoting 20 C.F.R. § 404.1527(d)(2)). When the ALJ does not give the treating physician's opinion controlling weight, the opinion is weighed considering the factors set forth in 20 C.F.R. § 404.1527(d)(2)-(6). See Shontos v. Barnhart, 328 F.3d 418, 426 (8th Cir. 2003). The factors under 20 C.F.R. § 404.1527(d)(2)-(6) include 1) the examining relationship; 2) the treatment relationship, including length of treatment, frequency of examination, and the nature and extent of the treatment relationship; 3) supportability; 4) consistency; 5) specialization; and 6) any other factors brought to the ALJ's attention tending to support or contradict the opinion.

In his June 23, 2010 decision, the ALJ did not give "controlling weight or great weight" to Dr. Eckhoff's opinions. AR 21. The ALJ gave several reasons for assigning Dr. Eckhoff's opinions little weight, two of which warrant discussion. First, the ALJ noted that when filling out the May 14, 2010 questionnaire, Dr. Eckhoff did "not purport to relate back to the claimant's date last insured." AR 21. On remand, it would be proper for the ALJ to determine what time period Dr. Eckhoff was referring to when he completed the limitations questionnaire in May of 2010.[17] Second, the ALJ pointed to Dr. Eckhoff's notes from an April 23, 2003 appointment that said Hanneman "is going to be seeing Dr. Hoversten I believe regarding the chest wall pain. If this workup is negative, we should probable [sic] proceed to a chest or lung CT, an MRI or a bone scan in that order. Presently I do not know what is causing the pain or discomfort. It is certainly not due to fibromyalgia." AR 514. The ALJ may have misinterpreted Dr. Eckhoff's statement to mean that Hanneman's fibromyalgia was not causing her any pain or discomfort at

---

[17] The administrative record on remand will contain the residual functional capacity assessment Dr. Eckhoff completed on August 23, 2002. This was not part of the administrative record at the time Hanneman's hearing.

all. AR 18; 21.  Dr. Eckhoff's notes from April 23, 2003, reflect that Dr. Eckhoff did not know what was causing Hanneman's chest wall pain, and noted in his records of his examination of Hanneman "fibromyalgia tender points remain present over the trapezia,  pectoralis majors, proximal forearms, [and] pes anserine bursa." AR 514.[18]

In his decision, the chief reason the ALJ gave for finding not credible Hanneman's statements concerning the intensity, persistence, and limiting effects of her symptoms was that Hanneman's statements were inconsistent with the ALJ's finding that Hanneman had no severe impairment or combination of impairments that were severe. AR 18. Because the ALJ will be taking a second look at his Step Two evaluation and may change his earlier finding that Hanneman does not suffer from a severe impairment, it makes little sense to delve into the ALJ's credibility determination at this time.

## VI. Conclusion

For the foregoing reasons, it is hereby

---

[18] In his notes from the August 23, 2002 appointment with Hanneman, Dr. Eckhoff states "Her form is reviewed with her and it is filled out.  The questionnaire asks about the diagnosis of impairment.  This has not been done.  She does have mild carpal tunnel syndrome on the right and impingement syndrome on the right shoulder." AR 520.  The form/questionnaire Dr. Eckhoff is referring to is the residual functional capacity assessment Dr. Eckhoff filled out on August 23, 2002. The ALJ interpreted Dr. Eckhoff's statement as meaning that Dr. Eckhoff "did not relate [Hanneman's] subjective complaints to medical findings." AR 21. The ALJ also found that this same statement and his interpretation of it undermined the credibility of Hanneman's statements concerning the severity of her fibromyalgia.  AR 18.  As noted above, Dr. Eckhoff's notes from the August 23, 2002 appointment identify Hanneman as having carpal tunnel syndrome and impingement syndrome.  In addition, the residual functional capacity assessment Dr. Eckhoff filled out on that same day had a section titled "diagnosis of impairments that you have made in this patient's case" under which Dr. Eckhoff listed Hanneman's carpal tunnel and shoulder impingement syndromes. AR 845. On remand, the ALJ will have an opportunity to reevaluate Dr. Eckhoff's findings in light of all the medical evidence.

ORDERED that the decision of the Commissioner is vacated and this action is remanded to the Social Security Administration for the purpose of determining, consistent with this Opinion and Order, whether Hanneman has a severe impairment, either singly or in combination and, if so, for the Social Security Administration to engage in the remaining steps of the analysis under 20 C.F.R. § 404.1520(a)(4).

Dated May **17**, 2012.

BY THE COURT:

ROBERTO A. LANGE
UNITED STATES DISTRICT JUDGE